**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

DARLA V.,

      Plaintiff,

v.                                Civil Action 2:22-cv-2175
                                   Judge James L. Graham
                                   Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Darla V., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.  BACKGROUND**

Plaintiff filed her application for DIB on December 26, 2018, alleging disability beginning September 6, 2016, due to a contusion to her right shoulder, sprain to her right shoulder, right shoulder bursitis, right rotor cuff disorder, internal derangement right shoulder, right shoulder posterior labral tear, right rotor cuff impingement, right rotor cuff tendinitis, capsular contracture, and substantial aggravation of a pre-existing acromioclavicular joint. (R. at 781–87, 812). After her application was denied initially and on reconsideration, Administrative Law Judge Kathleen Kadlec (the "ALJ") held a hearing on November 20, 2020. (R. at 575–96). On December 17, 2020, the ALJ issued a decision denying Plaintiff's application for benefits. (R. at 646–71). The Appeals Council granted review and issued a new decision on March 14, 2022, correcting a drafting error

and adjusting the ALJ's residual functional capacity ("RFC") finding. (R. at 1–11, 774–80). The Appeals Councils decision is the final decision of the Commissioner.

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 12, 15, 17).

### A. Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as well as her statements to the agency:

> [Plaintiff] alleges she is disabled due primarily to restriction of her right shoulder and extreme pain symptoms. She also alleges significant mental limitations due to depression, anxiety, and other issues. She reported she can lift only five pounds with her right arm and she has "excessive" pain and edema (Ex 3E/5). She alleges painful deep vein thrombosis and trouble walking and that she needs surgery on her neck (Ex 3E/5). She reported that she needs help dressing herself and that she can only prepare simple meals and do chores such as laundry, sweeping, and dusting (Ex. 3E/7). She can drive in a care and show in stores (Ex. 3E/8). She interacts with friends and family, watches television, plays games on her computer, plays with her grandchildren, and attends doctor appointments (Ex. 3E/9). She reported that she can pay attention for up to forty minutes, follow instructions, and interact with authority, but that she has issues walking, squatting, bending, standing, kneeling, climbing stairs, reaching overhead (Ex 3E/10). She reported she was fired from a job due to her "straight forward" personality, does not handle stress well, and does not handle changes in routine due to "OCD," though no such impairment is established in the medical evidence (Ex. 3E/11). She testified that she lost vision in her left eye. She testified that she cannot do household chores, cannot lift more than five pounds, can only stand for about fifteen minutes, does not shop in stores, and needs pain medication every four hours, contradicting some of her prior reports. She testified that her shoulder pain still rates at a ten out of ten, despite her reports of improvement to her doctors. At both hearings in November 2020, [Plaintiff] reported issues with eyesight preventing her from driving and had previously reported issues seeing at night (Ex. 3E/10). The record does not support significant visual limitations and [Plaintiff] is noted to drive multiple times in the record (e.g., Ex. 23F; 27F).

(R. at 656).

### B. Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records and symptoms related to her physical impairments during the relevant period:

*** The alleged onset date coincides with a shoulder injury she suffered while playing with her son. Initial imaging of her shoulder was normal, but she continued to report significant pain (Ex. 12F/22). An examination found mild bruising, tenderness, and pain limited range of motion, but [Plaintiff] was in no acute distress and exhibited no neurological or vascular symptoms (Ex. 12F/23). She later reported that she injured her shoulder at work while caring for a mentally challenged patient; the inconsistency is not addressed in the record, but it did cause workers' compensation to become involved (Ex. 12F/262). She received a corticosteroid injection and some physical therapy, but reported minimal relief (Ex. 3F; 12F/262). Her right shoulder range of motion remained limited by pain (Ex. 12F/264). An MRI obtained in January 2017 found mild subscapularis tendinosis, a tiny posterior labral tear, and an unremarkable acromioclavicular joint other than a small undersurface spur (Ex. 12F/31). [Plaintiff] underwent a right shoulder arthroscopic decompression in February 2018, but continued to report pain thereafter (Ex. 11F/6). Despite her complaints, an independent examination in November 2018 showed she had intact range of motion and "4/5" strength in the right shoulder (Ex. 11F/7). She continued to exhibit intact functional ability in musculoskeletal examinations through the date last insured (e.g., Ex. 26F/14, 31). In May 2019, [Plaintiff] reported that her pain is controlled with medication (Ex. 36F/54). She reported continued pain control with Percocet (Ex. 47F/7). She subsequently reported further improvement with injections and that her pain management allows her to meet the functional demands of her activities of daily life (Ex. 28F; 60F). [Plaintiff]'s shoulder impairment would reasonably be expected to cause or contribute to limitations on [Plaintiff]'s ability to lift, climb, and crawl, which have been addressed in the residual functional capacity. The mental limitations and limitations on exposure to hazards would also account for distracting pain symptoms and possible side effects of pain medication. No further limitations are warranted. [Plaintiff]'s pain is described as well-controlled, she does not present in distress consistently, and she was deemed able to manage funds by the consultative examiner (Ex. 11F/7; 26F; 27F; 28F; 36F/54; 43F/12; 44F/289, 293, 643; 47F/7; 49F/33; 60F).

[Plaintiff] also has a history of various cardiovascular issues, including paroxysmal atrial fibrillation, a transient ischemic attack, peripheral artery disease, and hypertension (Ex. 25F; 44F; 49F). [Plaintiff] was diagnosed with paroxysmal atrial fibrillation after reporting chest pain, shortness of breath, and palpitations in late 2019 (Ex. 44F). There was no concern of coronary artery disease, given a clean catheterization one year prior after complaints of arrhythmia and chest pain, after which she returned to normal daily activities without issue (Ex. 44F/322; see 4F, 12F). A March 2019 echocardiogram was also largely normal (Ex. 25F/78). Other examinations and testing in 2018 and early 2019 suggested no significant limitation (Ex. 4F; 12F/131; 13F/22; 26F). [Plaintiff] was monitored and evaluated in several visits in late 2019, after the date last insured, but was generally unremarkable in examinations. She exhibited some edema at an examination in early November (Ex. 44F/26), but her examinations were otherwise unremarkable and she appeared in no distress (Ex. 44F/288, 293, 643). Around the date last insured, [Plaintiff]

3

appeared in no acute distress with normal exams and normal diagnostic testing (Ex. 26F/12-13). The undersigned has considered [Plaintiff]'s occasional complaints of chest pain and shortness of breath during the period at issue and, as these are reasonably consistent with the medical evidence, finds that these symptoms would limit [Plaintiff]'s exertional capacity and tolerance for certain environmental exposure in the workplace. The residual functional capacity also accommodates any concerns of recurrent transient ischemic attack through limitation on exposure to hazards and potentially dangerous postural activities. Given [Plaintiff]'s stable presentation in examinations through the date last insured, however, greater limitations are not warranted by the overall record.

[Plaintiff] has also been treated for vascular issues and diagnosed with antiphospholipid syndrome, prothrombin gene mutation, and atherosclerotic disease in the lower extremities (Ex. 7F; 43F; 49F). Her treatment primarily consists of chronic Xarelto for anticoagulation (Ex. 7F/33). She has also had stents placed in her lower extremities (Ex. 49F/106). The record notes a history of thromboses and likely pulmonary embolism, but her clotting issues have been controlled on Xarelto (Ex. 7F; 13F). The record indicates she was doing well on Xarelto through the date last insured (Ex. 26F/29). A March 2020 ultrasound noted no evidence of venous insufficiency in the right lower extremity (Ex. 57F/4). As noted above, [Plaintiff] has exhibited lower extremity swelling on occasion, usually mild or trace, but is frequently noted to have no edema in most examinations (e.g., Ex. 12F/153; 25F/113, 629; 44F/5, 26, 272; 49F/109; cf., e.g., 12F/23, 104, 134, 161, 190, 214, 240, 256, 273, 281, 289, 294; 25F/276, 290, 292, 297, 325, 327; 44F/130, 275, 289, 299, 323, 326, 548, 627, 644, 650, 677, 681; 49F/36). Her doctor recommended she use compression stockings if she has lower extremity edema and she was counseled on elevating her legs (Ex. 44F/6, 27, 294). These recommendations are isolated and concurrent with the few findings of pitting edema in the record. Moreover, these recommendations were made after the date last insured. The record does not support the need to elevate her legs throughout a workday while seated. The record does not establish any chronic gait abnormality due to her vascular impairments or any other impairment that would preclude standing and walking for six hours in an eight-hour workday. She exhibited some gait issues after acute incidences, such as slipping on a wet deck and hurting her knee or falling on her hip in the snow (Ex. 12F/133; 13F/43). There is no indication that she suffers from painful hematomas as claimed at the hearing (Ex. 7F; 13F; 57F).

Just prior to the date last insured, a lift chair was ordered to "assist with raising from sitting to standing position due to chronic right shoulder pain and chronic [bilateral lower extremity] pain" (Ex. 36F/64). This is the only suggestion of any significant limitation transitioning from sitting to standing. This isolated order does not support the need for any special accommodations in this area. The residual functional capacity adequately accommodates [Plaintiff]'s shoulder and lower extremity limitations, such as they are supported by the overall medical record.

> [Plaintiff]'s longstanding asthma is "stable," but the residual functional capacity includes restrictions on exposure to pulmonary irritants to prevent exacerbation of this impairment (Ex. 26F/12, 28).

(R. at 657–58).

The ALJ also summarized Plaintiff's medical records and symptoms related to her mental health issues during the relevant period:

> [Plaintiff] has had limited treatment for depression, anxiety, and post-traumatic stress disorder, largely just through medication (e.g., Ex. 44F/289). Brief mental status examinations throughout the record are routinely unremarkable despite intermittent complaints of mental symptoms (e.g., Ex. 12F/153, 190 13F/55, 58; 44F/274). She frequently reported anxiety, depression, and obsessive-compulsive disorder in 2018, but psychiatric examinations noted "no evidence of mental instability, mood changes, or memory loss" (Ex. 7F). Her occasionally noted anxiety was treated through benzodiazepines through the date last insured (Ex. 12F/287; 44F/288-89). She is also noted to be occasionally depressed in examinations, but was "stable on meds" (Ex. 26F/13-14, 29-30). In May 2018, she completed a counseling intake with complaints of "high anxiety, depression and OCD" (Ex. 14F). She saw a counselor in a few visits for individual psychotherapy in a few visits thereafter (Ex. 29F). She subjectively reported that a "weight has been lifted" after venting her frustrations about her family relationships in therapy (Ex. 29F/14). She was emotional and labile at these visits, but she attended only five sessions in over a year (Ex. 29F). She returned a year later and again vented about situational stressors with her family and medical issues such as "cancer" (Ex. 58F). The record overwhelmingly supports the conclusion that [Plaintiff] was stable mentally with limited treatment through medication through the date last insured (Ex. 26F/13; 47F/8). Recent records indicate that [Plaintiff]'s cognition remains intact and her mood and affect are appropriate (Ex. 60F). Again, [Plaintiff] does not present in distress consistently and was deemed able to manage funds (Ex. 11F/7; 26F; 27F; 28F; 36F/54; 43F/12; 44F/289, 293, 643; 47F/7; 49F/33; 60F).
> ***

(R. at 658–59).

The Appeals Council also summarized Plaintiff's medical records and symptoms related to her mental health after the date of the ALJ decision:

> *** [Plaintiff] reported no issues following instructions or in memory (Exhibit 3E). She estimated to be of average intelligence with intact memory and fund of knowledge (Exhibit 27F). [Plaintiff] alleged difficulty getting along with others due to her personality (Exhibit 3E, pages 10 to 11). However, [Plaintiff] also reported that she interacts socially with others (Exhibit 3E, page 6). [Plaintiff]'s

counselor opined that [Plaintiff] has serious limitations in interacting with the public and maintaining socially appropriate behavior (Exhibit 70F), but this is not consistent with his own therapy progress notes, which documents [Plaintiff] venting about stressors in family relationships, but no "serious" behavioral issues (Exhibit 58F). The consultative examiner notes that [Plaintiff] would have "some difficulty" in this area, but this was based primarily on her reported history, rather than any specific findings in the examination (Exhibit 27F). [Plaintiff] alleged difficulty maintaining attention for more than forty minutes (Exhibit 3E, page 10). Her counselor opined she would be unable to meet competitive standards in this area due to poor stress response and inability to maintain pace (Exhibit 70F). However, at the consultative examination, [Plaintiff] had "some difficulty" with attention and concentration, but her concentration was also noted to be "fair;" and the examiner provided little specific evidence of [Plaintiff]'s difficulties (Exhibit 27F). The balance of the record contains routinely unremarkable mental status examinations with no consistent limitations in this area noted (Exhibits 7F; 12F; 26F; 29F; 44F, page 289; and 60F). [Plaintiff] reported poor stress response and poor adjustment to changes in routine (Exhibit 3E, page 11). However, [Plaintiff]'s symptoms are well-controlled on a conservative course of treatment, and she was observed with unremarkable presentation (Exhibits 7F; 12F; 26F; 29F; 44F, page 289; and 60F).

(R. at 5–6).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on June 30, 2019, and did not engage in substantial gainful employment during the period from her alleged onset date of September 6, 2016 through her date last insured of June 30, 2019. (R. at 651). The ALJ determined that, through her date last insured, Plaintiff had the following severe impairments: osteoarthritis, right shoulder; depression, anxiety, post-traumatic stress disorder; paroxysmal atrial fibrillation, transient ischemic attack, peripheral artery disease, and hypertension; asthma; antiphospholipid syndrome, history of pulmonary embolism, prothrombin gene mutation, and atherosclerotic disease of the lower extremities. (*Id.*). Still, the ALJ found that, through her date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (R. at 653).

As to Plaintiff's residual functional capacity ("RFC"), through the date last insured, the ALJ

6

concluded:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: lifting no more than ten pounds with the right arm; frequent operation of hand controls with the right hand; occasional reaching overhead with the right upper extremity and frequent reaching in other directions; frequent handling, fingering, and feeling with the right upper extremity[.]

(R. at 655).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 656–57).

Relying on the vocational expert's testimony, the ALJ found that, through the date last insured, Plaintiff was unable to perform her past relevant work as a licensed practical nurse. (R. at 661). The ALJ determined that, through the date last insured, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (R. at 661–62). She therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from September 6, 2016, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(g))." (R. at 663).

### D. The Appeals Counsel Decision

The Appeals Council adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable. The Appeals Council also adopted the ALJ's findings or conclusions regarding whether Plaintiff is disabled as well as agreeing with the ALJ's findings under steps 1, 2, 3, 4 and 5 of the sequential evaluation,

(R. at 4).

The Appeals Council found the record indicates that on December 14, 2020, subsequent to the hearing but prior to the date of the decision, treatment records from Fairfield Medical Center, dated April 13, 2020 (74 pages) were submitted, however, the Appeals Council determined that this additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether Plaintiff was disabled beginning on or before June 30, 2019.

The Appeals Council next corrected a drafting error in the hearing decision:

> *** [D]uring the hearing, in addition to the limitations included in the hearing decision, the hypothetical provided to the vocational expert included the limitations of occasional climbing ramps and stairs and ladders, ropes, and scaffolds, occasional stooping, kneeling, crouching, and crawling, occasional unprotected heights and moving mechanical parts, occasional motor vehicle operation, occasional exposure to humidity and wetness, occasional concentrated exposure to dust, odors, fumes, and pulmonary irritants, occasional exposure to extremes of cold and heat, simple routine tasks, simple work-related decisions, and occasional contact with coworkers, supervisors, and the public. The vocational expert testified that with these additional limitations, [Plaintiff] could perform the jobs listed by the Administrative Law Judge in the hearing decision (Hearing recording, 10:03:07AM, 10:04:43AM, and 10:07:06AM; and Decision, page 14). We therefore find that [Plaintiff] is limited to lifting no more than ten pounds with the right arm; frequent operation of hand controls with the right hand; occasional reaching overhead with the right upper extremity and frequent reaching in other directions; frequent handling, fingering, and feeling with the right upper extremity, occasional climbing ramps and stairs and ladders, ropes, and scaffolds, occasional stooping, kneeling, crouching, and crawling, occasional unprotected heights and moving mechanical parts, occasional motor vehicle operation, occasional exposure to humidity and wetness, occasional concentrated exposure to dust, odors, fumes, and pulmonary irritants, occasional exposure to extremes of cold and heat, simple routine tasks, simple work-related decisions, and occasional contact with coworkers, supervisors, and the public.

(R. at 5).

The Appeals Council also found the record supports these additional mental limitations:

> *** [Plaintiff] reported no issues following instructions or in memory (Exhibit 3E). She estimated to be of average intelligence with intact memory and fund of knowledge (Exhibit 27F). [Plaintiff] alleged difficulty getting along with others due to her personality (Exhibit 3E, pages 10 to 11). However, [Plaintiff] also

8

> reported that she interacts socially with others (Exhibit 3E, page 6). [Plaintiff]'s counselor opined that [Plaintiff] has serious limitations in interacting with the public and maintaining socially appropriate behavior (Exhibit 70F), but this is not consistent with his own therapy progress notes, which documents [Plaintiff] venting about stressors in family relationships, but no "serious" behavioral issues (Exhibit 58F). The consultative examiner notes that [Plaintiff] would have "some difficulty" in this area, but this was based primarily on her reported history, rather than any specific findings in the examination (Exhibit 27F). [Plaintiff] alleged difficulty maintaining attention for more than forty minutes (Exhibit 3E, page 10). Her counselor opined she would be unable to meet competitive standards in this area due to poor stress response and inability to maintain pace (Exhibit 70F). However, at the consultative examination, [Plaintiff] had "some difficulty" with attention and concentration, but her concentration was also noted to be "fair"; and the examiner provided little specific evidence of [Plaintiff]'s difficulties (Exhibit 27F). The balance of the record contains routinely unremarkable mental status examinations with no consistent limitations in this area noted (Exhibits 7F; 12F; 26F; 29F; 44F, page 289; and 60F). [Plaintiff] reported poor stress response and poor adjustment to changes in routine (Exhibit 3E, page 11). However, [Plaintiff]'s symptoms are well-controlled on a conservative course of treatment, and she was observed with unremarkable presentation (Exhibits 7F; 12F; 26F; 29F; 44F, page 289; and 60F).

(R. at 5–6).

As to Plaintiff's RFC, through the date last insured, the Appeals Council concluded:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: the claimant is limited to lifting no more than ten pounds with the right arm; frequent operation of hand controls with the right hand; occasional reaching overhead with the right upper extremity and frequent reaching in other directions; frequent handling, fingering, and feeling with the right upper extremity, occasional climbing ramps and stairs and ladders, ropes, and scaffolds, occasional stooping, kneeling, crouching, and crawling, occasional unprotected heights and moving mechanical parts, occasional motor vehicle operation, occasional exposure to humidity and wetness, occasional concentrated exposure to dust, odors, fumes, and pulmonary irritants, occasional exposure to extremes of cold and heat, simple routine tasks, simple work - related decisions, and occasional contact with coworkers, supervisors, and the public.

(R. at 8).

## II.   STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

*Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

In her Statement of Errors, Plaintiff argues that both the Appeals Council and the ALJ erred by failing to properly consider the supportability and consistency factors that are required by 20 C.F.R. § 404.1520c when evaluating the mental health opinions of the state agency psychologists, Karla Delcour, Ph.D., and Jaime Lai, Psy.D.; and for the medical source statement completed by Daniel Carpenetti, LPCC-S. (Doc. 15 at 12–16). Plaintiff also argues that the ALJ failed to consider the consistency factor when evaluating Orin Hall, M.D.'s opinion. (*Id.* at 16–19).

The Commissioner counters that the ALJ properly evaluated the opinions in accordance with the appropriate regulations. According to the Commissioner, Plaintiff's arguments regarding the opinion evidence ask the Court to reweigh evidence in a manner more favorable to Plaintiff. (Doc. 17).

10

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.*; s*ee also* 20 C.F.R. §§ 416.913(a), 416.920c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

20 C.F.R. § 416.913(a)(2), (5).

11

medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2).

Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

A. *State Agency Psychologists*

In discussing the state agency psychologists' opinions, the ALJ found:

> The opinions of the DDS psychological consultants that [Plaintiff] could perform only one- to three-step tasks, with occasional social interaction and occasional changes in job duties, are not persuasive (Ex. 1A; 3A). These mental limitations exceed what is supported by [Plaintiff]'s minimal mental health treatment and stable psychiatric presentation throughout the record, as discussed above. The residual functional capacity accommodates significant mental limitation but the degree of limitation assessed by the DDS consultant is not persuasive.

(R. at 659).

Here, the ALJ clearly considered the consistency of the state agency psychologists' opinions, as she found the opinions conflicted with most evidence throughout the record. Elsewhere, she described in detail the limited and conservative nature of Plaintiff's mental health treatment. (R. at 658–59). Significantly, Plaintiff's only experience in psychotherapy involved a mental health assessment by Daniel Carpenetti in May 2018, and follow-up visits with Mr.

Carpenetti amounting to "only five sessions in over a year." (R. at 659) (citing R. at 3861–86). The last of these sessions was outside the relevant time period. (R. at 3883–86) (July 1, 2019 visit). The ALJ noted that the psychotherapy was predominated by reports of situational stressors, like family and medical issues, and that Plaintiff subjectively reported that a "weight has been lifted" after venting about these stressors. (R. at 659) (quoting R. at 3874); (*see also* R. at 3861) (presenting problems at initial mental health assessment including being off from work due to shoulder injury, children, and near divorce); (R. at 3871) (Plaintiff reporting "stressors presented by family members"); (R. at 3877) (Plaintiff sharing about caring for a dying aunt, her "druggie" cousins, and a dying ex-sister-in-law).

Otherwise, the record contained brief mental status examinations which were "routinely unremarkable despite intermittent complaints of mental symptoms." (R. at 658) (citing R. at 1868 (negative for depression and hallucinations), 1905 (not nervous/anxious), 2068 (no depression on screening, but nervous/anxious), 2071 (screening suggesting moderate depression, but normal mood, affect, behavior, and thought content upon examination), 5662 (no anxiety or depression)). And when mental health symptoms were treated, it was conservatively with medication, on which Plaintiff appeared to be stable. (R. at 658–59) (citing R. at 5677 (describing a home benzodiazepine regimen for anxiety and OCD), 3783 (noting depression and anxiety, "stable on meds"), 6176 ("Anxiety controlled with Xanax prn")).

Plaintiff says the ALJ's consistency analysis failed to account for the fact that the state agency psychologists' opinions were consistent with the opinion of Marc Miller, Ph.D., who similarly opined "more severe restrictions than what the ALJ included in her RFC." (Doc. 15 at 14). Yet, the ALJ elsewhere found Dr. Miller's opinion unsupported, inconsistent, and unpersuasive:

13

> The examiner opined that [Plaintiff] would have "some difficulty" interacting with others, "some difficulty" in attention and concentration, and "issues" dealing with stress and pressure (Ex. 27F/5-6). These assessments appear to be largely based on [Plaintiff]'s subjective symptom reports as her mental status examination was unremarkable except for some tearfulness, as were her reported activities of daily living. The examiner's opinion is unpersuasive, as it is vague as to the degree of limitation [Plaintiff] experiences and it is poorly supported by his own examination of [Plaintiff].

(R. at 661). So to the extent that the state agency psychologists' opinions were consistent with Dr. Miller's opinion, they were all unpersuasive to the ALJ.

The ALJ further described the interconnectedness of these several opinions when discussing the supportability of the state agency psychologists' opinions. Plaintiff says the ALJ "never once discussed the level of support . . . provided by the state agency psychologists." (Doc. 15 at 14). The Undersigned disagrees. Though the ALJ did not discuss the supportability of the state agency psychologists' opinions within their first mention, she did elsewhere in the opinion, and an ALJ's opinion must be read as a whole. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). The ALJ later stated that "[t]he DDS psychologists based their opinions largely on a May 2019 consultative examination." (R. at 661) (citing R. at 3821–26) (Dr. Miller's evaluation). In other words, the ALJ considered the opinions' "reference to diagnostic techniques, data collection procedures/analysis, and other objective medical evidence." *Mary W. v. Comm'r of Soc. Sec.*, No. 2:20-cv-5523, 2022 WL 202764, at *8 (S.D. Ohio Jan. 24, 2022) (citing *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021)). But because the opinions predominately referred to an evaluation which the ALJ found overly reliant on Plaintiff's subjective symptom reports, unsupported by the doctor's own mental status examination and Plaintiff's reported daily activities of living, and inconsistent with the record as a whole—the state agency psychologists' opinions were not well-supported.

At base, Plaintiff wants the Court to assign more credibility to the opinions of the state

agency psychologists and Dr. Miller than did the ALJ. But that would put the Court in the role of reweighing evidence, which is impermissible. Relevant here, the ALJ considered the supportability and consistency of the opinions, and detailed substantial evidence for finding that the opinions were unpersuasive. Accordingly, the Undersigned finds Plaintiff's allegation of error regarding the state agency psychologists without merit.

### B. Daniel Carpenetti, LPCC

In discussing the opinion provided by Mr. Carpenetti, the ALJ determined:

> The [Plaintiff]'s counselor assessed extreme mental limitations that are unsupported by his own progress notes with the [Plaintiff] or any other evidence in the record (Ex. 70F). The narrative portions of this opinion form are inconsistent with the assessed "serious" limitations in various areas or with the assessment that she is "unable to meet competitive standards" in dealing with work stresses or performing at pace. This source saw the [Plaintiff] for individual therapy for fewer than a dozen visits in over two years. His progress notes indicates that the [Plaintiff] vents about her family relationships and other situational stressors, but there is nothing in the record that would support the limitations assessed here—the [Plaintiff] is consistently noted to be stable mentally on a very conservative course of treatment. This opinion is unpersuasive as it is poorly supported and exceeds even the other poorly supported opinions as to the [Plaintiff]'s mental status.

(R. at 660–61). Plaintiff says the ALJ failed to discuss the supportability and consistency factors regarding Mr. Carpenetti's opinion. The Undersigned disagrees.

Regarding supportability, the ALJ noted that Mr. Carpenetti's own progress notes and the narrative portions of his opinion failed to support and explain the checklist limitations he assessed for Plaintiff. As the ALJ had already discussed, and the Undersigned summarized above, Mr. Carpenetti's progress notes demonstrated that Plaintiff was dealing primarily with situational stressors related to her family and medical issues. Mr. Carpenetti provided no clear explanation why Plaintiff's anger and stress in dealing with family would cause her to be seriously limited in areas like making simple work-related decisions, responding to changes in a routine work setting, or accepting instructions and responding to criticism from supervisors. (R. at 6822).

Regarding consistency, the ALJ noted—similarly to the state agency psychologists' opinions—that the opinion was inconsistent with the full view of mental health evidence, which demonstrated Plaintiff was stable on a very conservative course of treatment with medication. In fact, the ALJ noted that Mr. Carpenetti's opinion "exceed[ed] even the other poorly supported opinions as to the [Plaintiff]'s mental status." (R. at 661). So, according to the ALJ, his opined limitations were even further afield from the evidence of record.

Finally, the Undersigned notes that the ALJ went beyond supportability and consistency and discussed the additional factor of Mr. Carpenetti's "[r]elationship with the [Plaintiff]." 20 C.F.R. § 416.920c(c)(3). In particular, she noted the length and frequency of the treatment relationship, stating that Mr. Carpenetti saw the Plaintiff "for individual therapy for fewer than a dozen visits in over two years." (R. at 661). And, as described in the section above, only his initial mental health assessment and four follow-up therapy sessions fell within the relevant time period. So the nature of his relationship with the Plaintiff did not support assigning great weight to his opinion.

In sum, the ALJ considered the supportability and consistency of Mr. Carpenetti's opinion, and detailed substantial evidence for finding that the opinion was unpersuasive. Accordingly, the Undersigned finds Plaintiff's allegation of error regarding Mr. Carpenetti without merit.

C.  *Orin Hall, MD*

In discussing the opinion provided by Dr. Hall, the ALJ determined:

A functional assessment form was completed by Orin Hall, MD, who treated [Plaintiff]'s shoulder impairment, in October 2020 (Ex. 69F). This opinion form was prepared in advance of [Plaintiff]'s disability hearing and indicated that [Plaintiff] could stand and walk for less than two hours in a workday, could only occasionally lift weights of less than ten pounds, could never use her right arm, hand, or fingers and could use her left for ten percent of the workday, would be off task twenty-five percent of a workday, and would miss more than four days of work per month. These extreme limitations are neither supported by evidence from late 2020, which would be well after the alleged onset date, nor are they supported by Dr. Hall's treatment records from two years prior. Indeed Dr. Hall cites only to

> [Plaintiff]'s "shoulder pain" and right shoulder impairments as the cause for these limitations and fails to explain how the right shoulder issue causes limitations in [Plaintiff]'s ability to sit, to stand and walk, to use her right hand and fingers, and to use her left arm, hand, and fingers. The record also fails to support the need for significant absences or time off task due to pain through the date last insured. The record indicates [Plaintiff] benefited significantly from treatment, such as injections, two years ago. She was in no acute distress, with a normal gait, and full passive range of motion, and "4/5" strength despite some pain in her right shoulder – her left shoulder was unremarkable (Ex. 28F).
>
> Dr. Hall noted "4/5" shoulder strength with unspecified decrease in grip strength, range of motion, and sensation in early 2019 (Ex. 51F). While [Plaintiff] continued to complain of extreme pain at times, her complaints were not consistent with objective findings and she was able to carry out daily activities adequately with treatment through injections (Ex. 52F). Dr. Hall's assessment is not persuasive, as it is not consistent with the medical evidence and many of the more extreme limitations, such as in use of the right hand and left upper extremity and the ability to sit and stand, are unsupported by any evidence. The residual functional capacity accommodates limitations in [Plaintiff]'s use of her right upper extremity that are supported by the overall record.
>
> Dr. Hall opined in May 2020 that [Plaintiff] could work with restriction on overhead reaching and lifting more than five pounds (Ex. 62F). He provided no objective findings that clearly support these limitations, noting only that she had "4/5" shoulder strength, tenderness in the shoulder, and "decreased" range of motion and grip strength. He did not describe the degree of restriction in functionally relevant terms. Moreover, these objective findings purportedly made on this date and the return-to-work restrictions are identical from his progress notes over a year earlier (Ex. 51F). Dr. Hall's restrictions on these two occasions are not persuasive as they are poorly supported and inconsistent with other evidence over those fourteen months showing [Plaintiff]'s shoulder had improved with treatment. Indeed, she reported ongoing seventy percent improvement from her injections and that she was able to attend to activities of daily living (Ex. 60F). Dr. Hall was also concerned an upcoming right upper extremity EMG, which was negative showing no significant neurological issues (Ex. 68F).

(R. at 659–60).

Plaintiff seemingly concedes that the ALJ appropriately addressed supportability, saying in her Statement of Errors only that "[t]he ALJ failed to consider the consistency factors when evaluating the medical source statement filled out by Dr. Hall on October 21, 2020." (Doc. 15 at 16). Indeed, the ALJ considered supportability in noting Dr. Hall's own treatment notes from the

17

relevant time period, in which he noted "'4/5' shoulder strength with unspecified decrease in grip strength, range of motion, and sensation . . . ." (R. at 660) (citing R. at 6379). The ALJ further noted that Dr. Hall had not described "the degree of restriction in functionally relevant terms[,]" and "fail[ed] to explain how the right shoulder issue causes limitations in the claimant's ability to sit, to stand and walk, to use her right hand and fingers, and to use her left arm, hand, and fingers[,]" in addition to "the need for significant absences or time off task due to pain . . ." (*Id.*).

Regarding consistency, the ALJ noted that "[t]he record indicates the [Plaintiff] benefited significantly from treatment, such as injections . . ." and "was in no acute distress, with a normal gait, and full passive range of motion, and '4/5' strength despite some pain in her right shoulder[,] her left shoulder was unremarkable." (R. at 660) (citing R. at 3827–60); (*see, e.g.,* R. at 3843–44) (April 2018, Plaintiff appearing for follow-up examination after right shoulder surgery, noted to be making "slow, but gradual progress" with right shoulder forward elevation to 90 degrees, abduction to 80 degrees, with pain, 4/5 strength, normal left shoulder examination and gait); (R. at 3841–42) (June 2018, Plaintiff in pain with right shoulder forward elevation to 90 degrees, 4/5 strength, normal left shoulder examination and gait); (R. at 3839–40) (August 2018, right shoulder forward elevation to 100 degrees, pain, full passive range of motion, normal muscle strength and tone, normal left shoulder examination and gait); (R. at 3837–38) (November 2018, right shoulder forward elevation to 140 degrees, full passive range of motion, but painful, 4/5 strength, no signs of instability, normal left shoulder examination and gait); (R. at 3835–36) (June 2019, noting "[Plaintiff] has been undergoing trigger point injections on her trapezius by Dr. Lingham and states that she has significantly improved from those injections[,]" right shoulder active forward elevation to 140 degrees, full passive range of motion, with no noted pain, 4/5 strength, no signs of instability, normal left shoulder examination and gait). Elsewhere, the ALJ noted that Plaintiff's pain was

18

controlled with medication. (R. at 657) (citing R. at 4712 (noting chronic right shoulder pain, controlled with Percocet prn), 6175 (same)).

In sum, the ALJ considered the supportability and consistency of Dr. Hall's opinion, and detailed substantial evidence for finding that his opinion was unpersuasive. Accordingly, the Undersigned finds Plaintiff's allegation of error regarding Dr. Hall without merit.

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:  February 10, 2023                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE